**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen (LR 5733)
Christopher S. Hinton (CH 0759)
Phillip Kim (PK 9384)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827

Attorneys for Plaintiff



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HUGUES GERVAT, DERIVATIVELY AND ON BEHALF OF CHINA VALVES TECHNOLOGY, INC., <br><br>             Plaintiff, <br> v. <br><br> SIPING FANG, BINJIE FANG, ZENGBIAO YU, PETER LI, and WILLIAM HAUS, <br><br>             Defendant, <br><br>        And <br><br> CHINA VALVES TECHNOLOGY, INC., <br><br>             Nominal Defendant. | CASE No.: <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR: <br><br> (1) BREACH OF FIDUCIARY DUTY <br> (2) GROSS MISMANAGEMENT <br> (3) CORPORATE WASTE <br> (4) RESTITUTION <br><br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff, Hugues Gervat ("Plaintiff"), derivatively on behalf of Nominal Defendant China Valves Technology, Inc. ("China Valves", or the "Company"), by his undersigned attorneys, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants,

United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding China Valves, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery, as many facts supporting the allegations contained herein are known only to defendants and/or are exclusively within their control.

## SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of Nominal Defendant China Valves. This action concerns the conduct by defendants and their affiliates during the approximate period of January 12, 2010 and January 13, 2011 (the "Relevant Period.") During this period of time, each of the Individual Defendants were officers or directors of the China Valve and had fiduciary obligations to China Valve and its shareholders. By this action Plaintiff seeks redress for China Valve for the Individual Defendants' gross dereliction of fiduciary duties owed to China Valves.

2.     During the Relevant Period, Defendants caused the Company to waste corporate assets by entering into a series of related-party transactions. These related party transactions resulted in the Company acquiring other business entities at inflated values thereby secretly transferring corporate assets to defendant Siping Fang and his family members while also not receiving equivalent value in exchange for the corporate assets transferred.

3.     Defendants failed to fulfill their fiduciary duties by failing to investigate the nature and quality of the transactions and by failing to inform themselves of material business activities. Moreover, the Individual Defendants breached their fiduciary duty to shareholders by failing to disclose the related-party nature of the transaction to shareholders, and failing to

disclose the true structure of the transactions that resulted in the corporation wasting its assets for inflated business entities.

4.     The Individual Defendants further sought to create the appearance that they were fulfilling their fiduciary duties, and had caused the Company to make full disclosures, by including a lengthy section entitled "Transactions with Related Persons" contained in certain reports filed with the SEC. For example, the Company's 2009 Annual Report filed March 29, 2010 on SEC Form 10-K contained a full page, six paragraph "related party transactions" section[1]. However, none of these sections actually disclosed the relatedness of the transactions subject of this action and these reports continued to conceal the true nature of the acquisitions and each of their related-party status.

5.     The Individual Defendants affirmatively claimed that they were subject to a Code of Ethics that otherwise governed their conduct and principles. This "Code of Ethics" was never included in the Company's SEC filings. Instead, the Company referred shareholders to its website. Notably, the "Code of Ethics" was never uploaded or viewable by shareholders. In fact, the 2009 Annual Report states "A copy of the Code of Ethics can be found on our website www.cvalve.com" yet concludes with a puzzling statement to itself: "China Valves, please make sure it was uploaded on the website." Of course, this is but the slightest of instances where the Individual Defendants knowingly caused the Company to publish statements that they knew or should have known were untrue and unsubstantiated.

6.     Fiduciary principles, as well as Generally Accepted Accounting Principles ("GAAP"), mandate that all material financial transactions between an issuer and its officers and

---

[1] Although the annual report was for 2009, the report provides that the related party transaction disclosure section included "any currently proposed transaction, in which we were or are to be a participant and the amount involved exceeded or exceeds $120,000." The report further reflects acquisitions that had been made after the close of the 2009 Annual Report but before the actual filing of the report with the SEC. *See, e.g.,* Exh. 21 to the 2009 Annual Report which lists Able Delight (Changsha) Valve Co., Ltd.as a 100% owned subsidiary.

directors be prominently disclosed in the financial statements. Despite these clear requirements, Defendants knowingly failed to disclose the related party transactions involving defendant Siping Fang and his family members. As a result, Defendants breached their fiduciary duties to the Company and also rendered China Valves' financial statements non-compliant with GAAP and materially misleading.

7.    It has further been alleged that Defendants' financial fraud runs far deeper than the undisclosed related party transactions and that Defendants' materially overstated the worth of the related party transactions and the benefits that the transactions would bring to the Company.

8.    Moreover, throughout the oversight of the Company, Defendants have repeatedly selected, and maintained relationship with, accounting firms that were clearly inappropriate for the Company's size, maturity and operations. Not surprisingly, these accounting firms have been, and are subject to past and ongoing scrutiny by the U.S. Securities and Exchange Commission for their roles in serving as accountings to numerous U.S.-traded Chinese companies that are now accused of accounting and reporting fraud. Beginning February 19, 2008, the Company engaged Moore Stephens Wurth Frazer and Torbet, LLP ("Moore Stephens") as its principal independent auditor. Moore Stephens and Frost, LP formed Frazer Frost, LLP effective January 1, 2010, who then became China Valves auditor. Frazer Frost had no offices in China, yet maintained a roster of clients that included 15 US-traded Chinese companies. The short-lived Frazer Frost, LP ceased operations in late 2010 after becoming embroiled in numerous scandals involving U.S. traded  Chinese companies, including RINO International. Moore Stephens was fined by the SEC for its role in the material overstatement of financial results by a Chinese company in 2004 and 2005, and has agreed not to accept any new clients from China, Hong Kong, or Taiwan until an independent evaluation of the firm has

satisfied the SEC.

9.    Further reflecting the Individual Defendants' fiduciary failures, and history of questionable oversight decisions, China Valves was 63rd out of 70 in a Piper Jaffray China Investment study ranking corporate governance performance, giving it one of the lowest corporate governance scores.

10.    In sum, Defendants stood idly by as defendant Siping Fang and his family were enriched through undisclosed related party transactions of approximately $35 million.    In addition, the Individual Defendants' accounting and reporting fraud continues to cause the Company harm as a securities fraud class action has been filed against the Company which will cost the Company money to litigate and perhaps settle, as well as a substantial diminution of the Company's market capitalization in the wake of the revelation of certain of the allegations herein.    Despite the massive harm caused to the Company by the related-party transactions, the Board has taken no action.    Defendants' conduct here is the very definition of extremely reckless conduct, which has resulted in massive damages for China Valves and its stockholders.

11.    Because the Company's officers and directors facilitated the wrongdoing alleged of herein, they cannot reasonably be expected to initiate litigation on the Company's fact.    In fact, such would require them to pursue litigation against themselves.    Accordingly, Plaintiff, on behalf of the Company, brings this shareholder derivative litigation.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 (a)(2) Plaintiff and Defendants are citizens of different states and the amount of in controversy exceeds $75,000.00 exclusive of interest and costs.

13.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

## PARTIES

14.    Plaintiff Hugues Gervat ("Plaintiff") resides in Milwaukee, Wisconsin and is a citizen of the State of Wisconsin.  Plaintiff is a current shareholder of China Valves and has continuously held China Valves at all relevant times.

15.    Nominal Defendant China Valves is a Nevada Corporation with its principal executive offices located at No. 93 West Xinsong Road, Kaifeng City, 475002 in the People's Republic of China.  China Valves, through its operating subsidiaries, purports to engage in developing, manufacturing, and selling low, medium and high-pressure metal valves for customers in China.  At all relevant times herein, the Company's common stock was actively traded on the NASDAQ under ticker "CVVT."  China Valves came to exist through a reverse merger with Intercontinental Resources, Inc. in December 2007 which had went through a myriad of business ranging from medical syringe development to mineral exploration prior to the reverse merger with China Valve Samoa.

16.    Defendant Siping Fang served as the Company's Chief Executive Officer ("CEO"), President, Chairman of the Board of Directors and Secretary beginning with the reverse merger with China Valve Samoa on in December 2007. Defendant Fang was the founder and sole shareholder of China Valve Samoa.  He resigned as CEO on October 8, 2010 but continues to serve as the President and Secretary, and continues to "lead the Company's Board" as Chairman.

17.    Defendant Binjie Fang is the son of Defendant Siping Fang.  Defendant Binjie Fang has been a director and the Company's Chief Operating Officer ("COO") since December

2007. During this time, Binjie Fang was responsible for "supervising company operations in various aspects and managing marketing and business development activities."

18.     Defendant Zengbiao Yu ("Yu") served as a director for the Company and member of the Company's Audit Committee, member of the Compensation Committee, and chair of the Corporate Governance and Nominating Committee at all relevant times. During the relevant period, his primary profession was as a professor. Appointed as a director effective January 30, 2008, Defendant Yu was originally to receive $17,000.00 annually along with stock options to serve as a director. On October 8, 2010, the board of directors approved an increase of this compensation to $5,000.00 per month, or $60,000.00 annually, for each of the "independent" directors.

19.     Defendant William Haus ("Haus") served as a director for the Company and member of the Company's Audit Committee and Corporate Governance and Nominating Committee, and chair of the Compensation Committee at all relevant times. During the relevant period, Defendant Haus was actively engaged in developing and executing reverse mergers involving Chinese companies. Defendant Haus was initially to receive $12,000.00 annually, along with stock options, for his services. On October 8, 2010, the board of directors approved an increase of this compensation to $5,000.00 per month, or $60,000.00 annually, for each of the "independent" directors.

20.     Defendant Peter Li ("Li") served as a director for the Company at all relevant times and served as the chairman of the audit committee and member of the Corporate Governance and Nominating Committee and Compensation Committee. According to the Company's 2010 Annual Report, Defendant Li also served as the Company's "audit committee financial expert as that term is defined by the applicable SEC rules." Defendant Li was initially

to receive $12,000.00 annually, along with stock options, for his services. On October 8, 2010, the board of directors approved an increase of this compensation to $5,000.00 per month, or $60,000.00 annually, for each of the "independent" directors.

21.    Defendants Haus and Peter Li have long-standing business relationships and share significant common business interests. In connection with their joint activities, both Defendant Haus and Defendant Li were contemporaneously first appointed to the board on November 22, 2008. Defendant Haus and Li's shared interest involves at least two other US-traded Chinese companies subject of allegations of fraud and accounting fraud – CS China Acquisitions Corporation / Asia Entertainment & Resources ("CS China") and Yuhe International.

22.    During the relevant period, Defendant Haus served as CEO and director of CS China. Defendant Li co-founded CS China and served as a director. The status and description of CS China evinces the indifference and conscious disregard with which Defendants Haus and Li treat their fiduciary obligations. According to the China Valve 2010 Annual Report filed in March 16, 2011 on SEC Form 10-K, "CS China Acquisitions Corporation" was "a special purpose acquisition corporation focused on effecting a business combination with a China-based private company." This description stands in stark contrast to CS China's own registration statement filed on Form POS AM on July 29, 2011. The Form POS states that "CS China" changed its name to "Asia Entertainment & Resources Ltd." on May 2, 2007 when it acquired Asia Gaming & Resort Limited. Moreover, as a result of the combination, "CS China" has since served as a profit sharing interest from gambling operations in Macau.

23.    Defendant Li also served as a director, Audit Committee Chairman, and member of the Compensation and Nominating Committees for Yuhe International, Inc. another US-traded Chinese company. Defendant Haus served as a Senior Partner with the Halter Financial Group

and as an analyst for the Pinnacle Fund & the Pinnacle China Fund.  Halter Financial Group advised and assisted Yuhe International in executing a reverse merger so that it could be publicly traded in US markets and the Pinnacle Funds collectively held 15% of Yuhe International.  Yuhe International was halted by the Nasdaq on June 17, 2011 after credible reports raised questions concerning the financial statements, undisclosed related party acquisitions, and overall validity of Yuhe International. Auditors of Yuhe International subsequently resigned due to management's misrepresentations and failure to disclose material facts regarding off-balance sheet transactions.

24.    Collectively, defendants Siping Fang, Binjie Fang, Yu, Li and Haus are referred to herein as the "Individual Defendants."

## THE AUDIT COMMITTEE

25.    The Company's audit committee is comprised of Defendants Li, Haus and Yu. The audit committee is charged with oversight of the Company's financial reporting and related disclosure.    According to the Company's 2010 10-K, the audit committee "is primarily responsible for reviewing the services performed by our independent auditors, evaluating our accounting policies and our system of internal controls." According to the Company's Audit Committee Charter, the purpose of the Audit Committee was to "represent and assist the board of directors in its general oversight of the Company's accounting and financial reporting processes, audits of the financial statements, and internal control and audit functions."

26.    The Audit Committee Charter also required that the audit committee was to "reviews and discusses with management and the independent auditor various topics and events that may have significant financial impact on the Company or that are the subject of discussions

between management and the independent auditors" and "reviews and approves related-party transactions."

27.     The Audit Committee Charter also required that the audit committee "establishes procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters."

28.     According to the Audit Committee Charter, management, which included Defendants Siping Fang and Binjie Fang, was responsible for "(a) the preparation, presentation and integrity of the Company's financial statements; (b) accounting and financial reporting principles; and (c) the Company's internal controls and procedures designed to promote compliance with accounting standards and applicable laws and regulations" and "periodically reviews with the Company's in-house and independent counsel any legal matters that could have a significant impact on the Company's financial statements, the Company's compliance with applicable laws and regulations, and any material reports or inquiries received from regulators or governmental agencies."

## OBLIGATIONS OF DIRECTOR AND OFFICER DEFENDANTS

29.     Each of the Individual Defendants owed to China Valves the duty to exercise loyalty, good faith, due care and diligence in the management and administration of the affairs of the Company and in the use and preservation of its property and assets, and owed the duty of full and candid disclosure of all material facts related thereto.  Further, the Individual Defendants owed a duty to China Valves to ensure that China Valves operated in compliance with all applicable federal and state laws, rules, and regulations; and that China Valves not engage in any unsafe, unsound, or illegal business practices.

30.    To discharge these duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of China Valves.  By virtue of this obligation, the Individual Defendants were required, among other things, to:

(a)    manage, conduct, supervise, and direct the employees, businesses and affairs of China Valves in accordance with laws, rules and regulations, and the charter and by-laws of China Valves;

(b)    neither violate nor knowingly or recklessly permit any officer, director or employee of China Valves to violate applicable laws, rules and regulations and to exercise reasonable control and supervision over such officers and employees; ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by China Valves;

(c)    remain informed as to how China Valves was, in fact, operating, and upon receiving notice or information of unsafe, imprudent or unsound practices, to make reasonable investigation in connection therewith and to take steps to correct that condition or practice;

(d)    supervise the preparation, filing and/or dissemination of any SEC filing, press releases, audits, reports or other information disseminated by China Valves and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers of China Valves and to make full and accurate disclosure of all material facts, concerning *inter alia*, each of the subjects and duties set forth above;

(e)    preserve and enhance China Valves' reputation as befits a public corporation and to maintain public trust and confidence in China Valves as a prudently managed institution fully capable of meeting its duties and obligations;

(f)    to avoid wasting the Company's assets;

(g)     to maximize the value of the Company's stock; and

(h)     to ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times.

29.     Each of the Defendants further owed to China Valves and the shareholders the duty of loyalty requiring that each favor China Valves' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage, which requires, *inter alia*, scrutiny of interested party transactions and rejection of such transactions which are unfair to the Company or evince corporate waste. The duty of loyalty further requires a duty of candor requiring full and candid disclosure of all facts relevant to any potential conflict of interest and said interested party transaction.

30.     Each of the Director Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)   approved or ratified these statements in violation of the federal securities laws.

## SUBSTANTIVE ALLEGATIONS

31.   Defendant China Valves, through its operating subsidiaries, purports to engage in developing, manufacturing, and selling low, medium and high-pressure metal valves for customers in China.  At all relevant times herein, the Company's common stock was actively traded on the NASDAQ under ticker "CVVT."

32.   During the Relevant Period, Defendants failed to ensure that controls were in place to facilitate accurate financial accounting and reporting by the Company, and caused the Company to enter into at least two related-party transactions: (1) the acquisition by China Valves of Able Delight Changsha Valve Co.; and (2) the acquisition by China Valves of Shanghai Pudong Hanwei Valve Co., Ltd. The related-party nature of each transaction was not disclosed to shareholders.  In both transactions, the Company paid inflated values for the business entities thereby secretly transferring corporate assets to defendant Siping Fang and his family members while also not receiving equivalent value in exchange for the corporate assets transferred.

## Failure to Oversee the Company's Internal Controls and Accounting Reporting

33.   The Individual Defendants failed to take appropriate action to ensure that the Company's transactions and financial affairs could be properly analyzed, oversaw and would be properly reported to the investment community.  The importance of adequate internal controls is made clear  in the Company's own Annual Reports and the incorporated Auditor Report, which provided, in relevant part:

> A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and

dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

34.     As set forth herein, these internal control inadequacies, along with the Individual Defendants' misconduct, are directly responsible for the harm caused to the Company as asserted herein.

35.     The Individual Defendants have known of significant deficiencies in internal accounting controls since at least 2008. In the Company's 2008 Annual Report, the Company acknowledged that it had identified material weaknesses related to the Company's accounting and finance personnel, a lack of internal audit function, and a lack of internal audit system. These same problems had been identified and existing since at least 2007.

36.     Despite this knowledge, the Individual Defendants have utterly failed to take any corrective action to ensure accurate financial and transactional reporting. Rather, they have not only abandoned their fiduciary duties to take corrective action and ensure proper oversight, but facilitated the deficiencies by retaining an inadequate independent auditor, as set forth below. Consequently, according to the 2010 Annual Report filed with the SEC on March 16, 2011, and the associated Auditor Report:

> *Control Environment* - The Company's control environment did not sufficiently promote effective internal control over financial reporting. Specifically, the Company did not conduct a comprehensive risk assessment during the year with all of its major transactions. In addition, the lack of oversight from top management also result in incomplete disclosure on its acquisitions. These control deficiencies by themselves do not directly result in a material misstatement to the financial statements; however, deficiencies in the control environment are pervasive in nature.

*Accounting and Finance Personnel Weaknesses* – US GAAP expertise. The Company's current accounting staff is relatively new and inexperienced, and needs substantial training to meet the higher demands of being a U.S. public company. The accounting skills and understanding necessary to fulfill the requirements of U.S. GAAP-based reporting, including the skills of subsidiary financial statements consolidation, are inadequate and were inadequately supervised. The lack of sufficient and adequately trained accounting and finance personnel resulted in ineffective top level review and analysis of year-end evaluation of the Company's inventory and AR allowance This material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2010 financial statements, and this report does not affect our report dated March 16, 2011 on those financial statements.

In our opinion, because of the effect of the material weakness described above on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2010, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

37.    Thus, Defendants were aware or were reckless in not knowing that China Valves' internal controls were defective and that there was a high risk of inaccurate and misleading financial statements being issued by the Company.  Instead of fixing the defective internal controls, the Individual Defendants concealed and perpetuated the lax internal controls so as to continue their fraud, and authorized the Company to engage in related party transactions to its detriment, and for the improper benefit of themselves and relatives.

## Retention of Unqualified Auditor - Use And Continued Retention Of Frazer Frost, LLP

38.    Throughout the oversight of the Company, Defendants have repeatedly selected, and maintained relationship with, accounting firms that were clearly inappropriate for the Company's size, maturity and operations.  Not surprisingly, these accounting firms have been, and are subject to past and ongoing scrutiny by the U.S. Securities and Exchange Commission for their roles in serving as accountings to numerous U.S.-traded Chinese companies that are

now accused of accounting and reporting fraud. Beginning February 19, 2008, the Company engaged Moore Stephens Wurth Frazer and Torbet, LLP ("Moore Stephens") as its principal independent auditor.    Moore Stephens and Frost, LP purportedly formed Frazer Frost, LLP effective January 1, 2010, who then became China Valves auditor. Frazer Frost had no offices in China, yet maintained a roster of clients that included 15 US-traded Chinese companies.    The short-lived, if it ever actually was properly constituted, Frazer Frost, LP ceased operations in late 2010 after becoming embroiled in numerous scandals involving U.S. traded  Chinese companies, including RINO International.  In addition, Moore Stephens was fined by the SEC for its role in the material overstatement of financial results by a Chinese company in 2004 and 2005, and has agreed not to accept any new clients from China, Hong Kong, or Taiwan until an independent evaluation of the firm has satisfied the SEC.

39.    Equally troubling is that the Individual Defendants have continued to retain and advance Frazer Frost LLP as the Company's auditor despite that the fact that Frazer Frost LLP had essentially ceased operations as Frazer Frost LLP in November 2010. As a consequence of its involvement in numerous Chinese reverse-mergers, the two initial firms terminated the short-lived "trial merger" and reverted back into their original entities in November 2010.  According to Moore Stephens, the separate firms were "moving to resume operations as separate entities, as existed prior to their combination in January 2010."  Despite the involvement of Frazer Frost in numerous scandals, and the fact that Frazer Frost  was defunct by November 2010 and would not be providing any services to any Company as of November, 2010, the Individual Defendants proposed that "Frazer Frost LLP" to be China Valves' auditor  in a June 1, 2011 proxy statement. In that proxy statement, the "Audit Committee of our Board of Directors has appointed Frazer Frost LLP ("Frazer Frost") as our independent registered public accounting firm to audit our

financial statements for the year ending December 31, 2011, and recommends that our stockholders vote to ratify such appointment." The Individual Defendants maintained this proposal and the associated July 12, 2011 shareholder meeting to ratify such proposal. Not disclosed in the proxy statement were the true facts concerning Frazer Frost, among others, that Frazer Frost had been discredited through its involvement with companies associated with material accounting irregularities and that it was defunct and no longer providing services to any companies.

40.    By selecting and retaining Frazer Frost as China Valves' auditor, the audit committee members, and the other members of the board, hired a highly discredited auditing firm either knowingly or recklessly. The Individual Defendants conduct in connection with the continued representation of the retention of Frazer Frost LLP evidences that each have breached their duty of candor owed to shareholders, and has failed to adequately inform themselves of information concerning Frazer Frost, despite choosing to foist Frazer Frost upon the Company and shareholders. Moreover, the Individual Defendants continued selection and advancement of Frazer Frost, even if it such an entity was in good standing to provide auditor services, demonstrates that each has breached their fiduciary duty of loyalty by retaining a non-existent firm that cannot provide services to the Company, and that has interests that conflict with the Company and shareholders in discovering the truth regarding the related-party transactions given its own liability, because it serves each of the Individual Defendants personal interests of maintaining the ongoing fraud and preventing shareholders and the Company from discovering the full extent of the harm caused to the Company as a result of the Individual Defendants' conduct.

**Related-Party Transactions**

41.    Generally Accepted Accounting Principles ("GAAP") and SEC regulations required the Company to disclose all material related party transactions.

42.    Statement of Financial Accounting Standards ("SFAS") No. 57 and No. 850 provide that a public company's "[f]inancial statements shall include disclosures of material related party transactions." SFAS No. 57 ¶ 2; 850-10-50-1 . "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." SFAS No. 57 ¶ 1; 850-10-05-3. "Affiliate" includes any company that is under common control or management with the public company. SFAS No. 57 ¶ 24(a, b); 850-10-20.

43.    China Valves, like all Chinese companies, is required to file annual comprehensive accounting reports with the provincial authorities, the China State Administration of Industry and Commerce ("SAIC") annually.  These SAIC filings include (amongst others) entries for revenues, profits, assets, and Cost of Goods Sold ("COGS").

•    49.    Disclosures of related party transactions shall include (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. SFAS No. 57 ¶ 2; 850-10-50-1.

## Able Delight Acquisition

44.    On or around January 12, 2010 China Valves issued a press release informing shareholders that it had signed a letter of intent to acquire Able Delight (Changsha) Valve Co.

The press release gave no indication that the acquisition involved asset-transfers to related-parties. In sharp contrast, the press release suggested that the acquisition was similar to any other arms-length transaction:

> "We are extremely pleased with the progress we have made so far in our negotiations with Able Delight, as we believe this acquisition will improve our position in key end-user markets in the water supply and power generation industries, in addition to strengthening our distribution network," said Mr. Siping Fang, Chairman and CEO of China Valves. "We hope to finalize our internal due diligence by the end of this month and complete the acquisition during the first quarter of 2010."

45.     On February 8, 2010 the Company filed an 8-K with the SEC, signed by defendant Siping Fang, stating that it had entered into an asset purchase agreement to acquire Able Delight for approximately $15 million in cash. The asset purchase agreement attached to the February 8, 2010 8-K lists only two parties to the agreement: "Party A: Able Delight Investment Limited" and "Party B: China Fluid Equipment Holdings Limited".

46.     In a Company press release issued that same day announcing the completion of the acquisition of Able Delight, the Company touted that Able Delight's financial results would be consolidated with the Company's and that Able Delight would contribute approximately $20.5 million in revenue and $5 million in net income to the Company's results for the fiscal year 2010. Again, China Valves failed to disclose the related-party nature of the transaction. The announcement states in relevant part:

> China Valves Technology, Inc. (Nasdaq: CVVT) ("China Valves" or the "Company"), a leading metal valve manufacturer with operations in the People's Republic of China (the "PRC"), today announced that on Feb 3, 2010, the Company has completed the transaction to acquire 100% asset ownership in Able Delight (Changsha) Valve Co., Ltd., ("Able Delight"), a leading valve manufacturing enterprise that specializes in manufacturing valves for the water supply and power supply industries. Consideration for the acquisition is approximately $15 million in cash, which the Company will pay in full by the end of February. As result of this acquisition, Able Delight became a wholly-owned subsidiary of China Valves.

China Valves will consolidate Able Delight's operations into its financial results effective February 2010. For fiscal year 2010, the Company expects Able Delight to contribute approximately 140 million RMB ($20.5 million) in revenue and 34 million RMB ($5.0 million) in net income. Able Delight expects to deliver its current backlog of orders valued at approximately 90 million RMB ($13.2 million) by the end of 2010.

47.     Beginning from the initial statement concerning the Able Delight acquisition through November 18, 2010, the Individual Defendants failed to disclose, and caused the Company to hide from investors, the true related-party nature of the transaction as well as the true financial performance and attributions of Able Delight.

48.     On November 18, 2010 the Company filed with the SEC a Form 8-K/A amending the November January 8, 2010 8-K.  The November 18, 2010 amendment revealed for the first time the previously undisclosed related party nature of the transaction and raised serious doubts about the value of Able Delight.  The November 18, 2010 8-K/A revealed that Able Delight was purchased from a subsidiary of the billion dollar NYSE listed company, Watts Water Technologies ("Watts Water").

49.     Watts Water's SEC filings provide a much different picture of Able Delight than China Valves had provided to investors.  According to Watts Water's SEC filings, Able Delight lost $5.3 million in 2009, the subsidiary was under foreign corrupt practices investigation and Watts Water shut it down as a result.  This stands in sharp contrast to the $5 million in net income for 2010 that Able Delight was purportedly going to contribute to China Valves according to the Company's February 8, 2010 press release.

50.     The November 18, 2010 8-K/A also revealed that the actual price paid to Watts Water for the assets of Able Delight was only $6.07 million.  The 8-K/A states in relevant part:

On February 3, 2010, China Fluid Equipment Holdings Limited ("China Fluid"), a wholly-owned subsidiary of China Valves Technology, Inc. (the

"Company"), entered into an asset purchase agreement (the "Asset Purchase Agreement") with Able Delight Investment Limited to purchase all of the assets of Able Delight (Changsha) Valve Co., Ltd. ("Able Delight") for a cash price of approximately $15 million.

**Although Able Delight was controlled by Qing Lu at the time of the** Able Delight would be funded by the Company and act as the Company's agent or nominee in acquiring Changsha Valve, as evidenced in part by the appointment of Company personnel to management positions at Changsha Valve prior to the China Fluid Acquisition of Changsha Valve on February 3, 2010.

\*       \*       \*

Qing Lu received $50,000 for acting as the sole stockholder of Able Delight on behalf of the Company and the remaining balance of $15 million paid by China Fluid in the China Fluid Acquisition of Changsha Valve was used to cover costs of the acquisition, including the payment of various accounts payable as discussed above.

51.    The disclosure concerning the true purchase price, third party payments and related-party status of the acquisition caused the Company's stock to fall $1.61 per share, or 15% on November 19, 2010.

52.    Astonishingly, the 8-K/A left undisclosed that Qing Lu is the wife of Bin Li, the first cousin of Defendant Siping Fang.

53.    The Citron Report summarized the fiction of the Able Delight acquisition:

**Able Delight – The Myth**

The Company first reported its intention to acquire the assets of Able Delight for 15 million USD on January 12, 2010, a few weeks after closing a 22 million USD private placement. The press release described Able Delight as a leading producer of valves. The transaction was completed on February 3rd, 2010. In CVVT's February 8-K, the assets purchased in this transaction included 4.94 million USD of Inventory and 10.11 million USD of PP&E. ….which seems simple enough.

But then something happened in November. Whether an SEC inquiry or pressure from the auditors we don't yet know, but the company amended the 8-K and disclosed something closer to the truth.

In the amended 8-K on November 18th, 2010, the company reveals for the first time that Able Delight was in fact a subsidiary of billion-dollar Watts Water Technologies, (NYSE:WTS). The SEC filings of Watts paint a very different picture of the operating profile of the company than described by CVVT. According to Watts' 10-Q and 10-K, Able Delight (Changsha) Valve lost 5.3 million USD in 2009. Worse, the subsidiary was under foreign corrupt practices investigation and Watts shut it down as a result of that.

However, under ownership of China Valves, we are to believe an instant turnaround had happened. CVVT estimated the subsidiary to contribute 20.5 million USD of revenue, twice of the previously reported revenue number by Watts, and 5 million USD of net income, instantly turning around a 5.3 million USD loss in 2009....Good luck getting that past an auditor.

Worse, we learn in the amended 8-K filed in November that only 6.07 million USD was paid for the "assets" of Able Delight to Watts (who filed that they received 5 million) and an additional 8.93 million USD went to the owner of Able Delight, purportedly for a list of other tangential expenses listed as "(approx)'. So who is this mystery owner who received the bonanza?

**Now this would get you "locked up" in the United States:** The November 8-K states the CVVT bought Able Delight from a "third party" Qing Lu, and the company lent Lu the money to buy the subsidiary. Yet what was not disclosed is that Qing Lu shares the same residential address and co-owns the same house as Bin Li, who's the first cousin of Siping Fang (Chairman of CVVT) and 34% owner of the Company.

\*\*\*

It is almost as if China Valve was trying to break a record with how many securities laws can be broken with a single transaction. From misstating ownership of a company, to an undisclosed related party transaction, to inflating revenue projections, and lastly hiding the actual name of the business, for this 4-in-1 disclosure failure … we tip our hats to their management team!

54.    The nature and quality of the Able Delight remains unknown and the Company's 2010 Annual Report further calls into question the veracity of even the purportedly corrective disclosures. The 2010 Annual Report, filed March 16, 2011 states, in relevant part:

> In February 2010, the Company acquired all the equity interests in Able Delight (Changsha) Valve Co, Ltd., formerly an indirect subsidiary of Watts Water Technologies, Inc. ('Watts'), for a purchase price of $12.12 million plus certain assumed obligations and acquisition expenses of $2.81 million, or an aggregate expenditure of approximately $15 million. Changsha Valve was purchased from Able Delight Investment, Ltd., which had acquired Changsha Valve from Watts in January 2010 with $6.07 million from funds loaned to it by the Company. The Company directly paid the balance of $8.93 million to other parties as disclosed in 8ka released on November 18, 2010.

55.    The gross extent of the Individual Defendants' recklessness and/or negligent disregard in reviewing, approving, and disclosing the Able Delight related-party acquisition is clear upon a close inspection of the transaction, what was initially disclosed, and the purported truth subsequently disclosed (yet largely still unknown given that China Valves' auditor has been defunct since essentially the beginning of 2011 yet the Individual Defendants sought and obtained ratification of the non-existent auditor on July 12, 2011). China Valves expended approximately $15 million in cash for Able Delight. At the end of 2009, shortly before the acquisition, China Valves only had $14.4 million in cash and cash equivalents. Thus, there is no question that the transaction was a material transaction that required the utmost attention and oversight in reviewing.

56.    China Valves initially disclosed that it was paying approximately $15 million for assets of approximately 4.94 million USD of Inventory and 10.11 million USD of property, plant and equipment ("PP&E"). In the asset purchase agreement dated February 3, 2010, China Valves represents that "Party A agrees to sell all of the *assets* of Able Delight. . . for a consideration of $15 million (subject to the Appraisal Report)." (emphasis added). Moreover,

"Able Delight's tangible and intangible assets . . . are not subject to any collateral, pledge, lien or any third party claims."   In reality, it paid $15 million for  approximately $5 million in assets, and, assuming the accuracy of the amended SEC filings, liabilities of approximately $9 million, along with a related party payment of no less than $50,000.00, and an unaccounted for $1 million.

57.     China Valves represented it purchased an independent business that was reasonably able to contribute $20.5 million in revenue and $5 million in net income for the 2010 Fiscal Year.  In reality, Able Delight was subject to significant auditor oversight, having been a subsidiary of a billion dollar company, and had lost $5.3 million in 2009 and its future outlook was bleak considering that it was under foreign corrupt practices investigation and had been shut down by its former owner as a result.

58.     China Valve represented that it was making a straight-forward purchase of a business entity, when, in reality, it had arranged for a complex asset transfer that served to distribute assets to family members of Siping Fang.  In summary, the gross discrepancies between reality and that which the Individual Defendants caused the Company to disclose regarding a significant material facially evidences the disregard and recklessness in which they acted as fiduciaries.

**Hanwei Valves Acquisition**

59.     On February 11, 2010 the Company issued an announcement that it had signed a letter of intent to purchase 100% equity ownership of Shanghai Pudong Hanwei Valve Co., Ltd. ("Hanwei Valve") for approximately $20 million.   In the press release announcing the acquisition, the Company exalted the virtues of the apparent newfound acquisition:

> "We are very excited about the addition of Hanwei Valves to China Valves, as we believe the sophisticated products and patented applications

will improve our position in key end-user markets such as the petrochemical industry and bioengineering, while strengthening our distribution network in our core industries of water supply and power generation. . . . " said Mr. Siping Fang, Chairman and CEO of China Valves. "We are currently in the process of finalizing our internal due diligence, and hope to provide more updates to the market regarding the expected revenue and net income contribution of this acquisition after its completion."

60.     On April 9, 2010 the Company filed with the SEC an 8-K, signed by Siping Fang, announcing the completion of the Company's acquisition of Hanwei Valve for approximately $21 million.  As with Able Delight, the Company stated that the acquisition would contribute $20 million in revenue and $5 million in net income to the Company's Fiscal 2010 results.

61.     Attached to the April 9, 2010 8-K was the Asset Transfer Agreement referenced in the 8-K.  The Asset Transfer Agreement identified four parties to the agreement: "Party A: Henan Tonghai Fluid Equipment Co., Ltd."; "Party B: Shanghai Pudong Hanwei Valve Co., Ltd. ("Hanwei Valve")"; "Party C: Shanghai Hanhuang Valve Co., Ltd"; and "Party D: Hong Kong Hanxi Investment Co., Ltd."   The Agreement made clear that Parties C and D owned and controlled the assets of Hanwei Valve (Party B), were the sole parties entitled to any cash assets held by Hanwei Valve prior to the closing (indicating 100% ownership) and were thus the only parties to the transaction that could make express warranties and representations concerning Hanwei Valve.  Notably, this also made them separate and wholly unrelated entities from China Valves (which acted through Party A):

> Party C and Party D established Hanwei Valve on January 23, 2002 to be a manufacturer of high-end valves used in petroleum chemical industry. Upon friendly consultation, Party A, B, C and D have reached the following agreement (the "Agreement") on April 8, 2010:
>
> Section 1. Transfer Price
>
> Party B, C and D agree to sell all of the assets of Hanwei Valve to Party A for a consideration of $21 million (the price may be adjusted upon the

asset evaluation).

Section 2. Representations and Warranties

1.    Party C and Party D represent that the tangible and intangible assets of Hanwei Valve (including but not limited to land, buildings, equipment and intellectual property) are not subject to any collateral, pledge, lien or any third party claims. Party C and Party D will take all responsibilities arising out of any claims if the representations are not accurate.

2.    Party C and Party D represent that they will not be directly or indirectly engaged in any business that may be competitive with Hanwei Valve, its technology or products in ten years from the execution of the Agreement.

3.    Any cash in Hanwei Valve's accounts before the execution of the Agreement belongs to Party C and Party D.

62.    The Company's statements about the nature, quality and circumstances of its acquisition of Hanwei Valves were materially false and misleading.  In reality, this was yet another related-party transaction as China Valve was already a co-owner of Hanwei Valves, and it was not just an "asset sale."

63.    According to Chinese regulatory filing made with the Chinese State Administration of Industry and Commerce ("SAIC"), China Valves actually owned Party C to the Asset Transfer Agreement, Shanghai Hanhuang Valve Co., Ltd., prior to the acquisition.  The Citron Report states in relevant part:

In the Company's 8-K filed on April 9th, 2010, it clearly stated several points leading to the conclusion that Party C and D, which owned Party B (from which assets are acquired) are unrelated parties. **But here is a document that tells us a different story.** In another seemingly undisclosed related party transaction, this document below shows in fact that **China Valve owned party C prior to the acquisition.**



SAIC Filing of Shanghai Hanhuang Valves

64.    Moreover the Individual Defendants caused the Company to mischaracterize the

Hanwei Valves transaction as an "asset sale".  The Citron Report states:

> Furthermore, the company presents this transaction as an "asset sale" and goes as
> far as to claim that Party C and Party D represent that the tangible and intangible
> assets of Hanwei Valve (including but not limited to land, buildings, equipment
> and intellectual property) are not subject to any collateral, pledge, lien or any third
> party claims. Party C and Party D will take all responsibilities arising out of any

claims if the representations are not accurate. It further says on non-compete clauses...

***

Yet we read as of today that CVVT did not in fact buy just the assets but rather they bought the whole company, which could easily include undisclosed liabilities. MORE IMPORTANTLY, when you buy just the assets of a company, you do not have to file financials on the acquisition but when you buy a full company, you are required to....so its [sic] another auditing nightmare....good luck. Below is proof that China Valve now owns all parties B, C, and D.





65.    The nature and quality of the Hanwei Valves acquisition remains unknown and the Company's 2010 Annual Report further calls into question the veracity of even the purportedly corrective disclosures.  The 2010 Annual Report, filed March 16, 2011 states, in relevant part:

> On April 8, 2010, the Company acquired from certain unaffiliated individuals the two entities that were owners of the joint venture that in turn owned Shanghai Pudong Hanwei Valve Co., Ltd. ("Hanwei Valve"), together with certain intangible assets used in the operation of Hanwei Valve, for an aggregate of $19.5 million.

66.    In addition to the lack of candor, and the exposure facing the Company as a result of shareholder class action lawsuits, the Company's goodwill and reputation in the marketplace has been severely damaged. Consequently, the Company's ability to access capital markets to both grow and invest in additional business opportunities has been eliminated as a result of the Individual Defendants' conduct. Prior to the announcement of the Able Delight acquisition on January 12, 2010, the Company's stock traded for $10.42 per share. It maintained this price through the acquisition of Hanwei Valves and closed at $13.40 on April 9, 2010. When the market learned of the adverse information about the related party transactions through an analyst report issued by Citron Research on January 13, 2011, the price of the Company's stock fell from $8.72 per share to $7.15 per share on January 14, 2011. The stock price has continued to decline as the market has learned that the Company is worse than a headless horseman – it is being driven by the Individual Defendants whose reckless conduct ensures that the ship will sink. As of August 25, 2011, the Company's share price was $2.36 per share.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

67.    Plaintiff brings this action derivatively on behalf of the Company to redress injuries suffered by the Company as a direct and proximate result of the Individual Defendants' conduct. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

68.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting the Company's rights.

69.    At the time this action was commenced, the Board of Directors consisted of five directors, the Individual Defendants: Siping Fang (Chairman), Binjie Fang, Zengbiao Yu, Peter

Li and William Haus.

70.    Plaintiffs have not made any demand upon the current China Valves Board of Directors to bring an action asserting the claims herein to recover damages for the injuries suffered by China Valves, since such demand would be futile, and is therefore excused, for the following reasons:

(a) **Conduct Not Subject of Business Judgment Rule**:  As alleged in this Complaint, the entire Board of Directors participated and/or acquiesced in the wrongs complained of.  These actions constituted unlawful misconduct that cannot be ratified and is not within the protection of the business judgment rule.  In fact, the directors breached their duty of care for failure to monitor, as they knew or should have known that violations of law were occurring, and they took no steps in a good faith effort to prevent or remedy that situation, and such failure proximately resulted in the losses complained of.

(b) **Legal Liability Creates Insurmountable Conflict of Interest**: The entire Board of Directors is subject to liability for breaching their fiduciary duties to China Valves by, inter alia, participating in the design of and/or executing the illegal business conduct described herein, and concealing, , disguising, failing to detect, prevent, or halt the violations of law complained of herein.  As specifically alleged herein, given the amount of money at issue in the transactions, the significance of the related-party transactions, and the retention of an inadequate and discredited accounting firm, the Board of Directors must have known of and approved it or were so grossly uninformed as to abdicate their responsibility as directors of the Company.  Moreover,

members of the Company's Audit Committee, which are also the only purported "independent" directors, Li, Haus and Yu also breached their fiduciary duties to the Corporation and its shareholders by failing to implement and/or enforce policies to prevent the related party transactions complained of herein, and failing to fulfill their fiduciary duties to obtain adequate monitoring and review of the Company's financial statements. These same members are also liable as the sole members of the Company's Corporate Governance and Nominating Committee which is tasked with "overseeing the creation and implementation of our corporate governance policies and procedures."  Demand is thus excused because the Board of Directors are not disinterested parties and lack sufficient independence to exercise the business judgment necessary to determine whether to prosecute claims against themselves, and persons with whom they have extensive business and personal entanglements, if plaintiffs demanded that they do so.

(c) **Domination of Board and Internal Conflicts of Interest of Directors Precludes Independence:** The known principal wrongdoer, Siping Fang and main beneficiary of the wrongdoing complained of herein was in a position to, and did dominate and control the Board of Directors, the nomination of any new director nominated or appointed by him and/or the appointment of new directors.  Thus, the Board cannot exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action in fact.  As clearly exemplified by the complained of transactions, Siping Fang runs China Valves like a family run business and maintains such control

through his domination of the Board of Directors. Defendant Siping Fang was the founder of the Company, served as its CEO until late 2010, and continues to serve as President, Secretary and Chairman of China Valves, as he has since the Company's inception.    In addition to Siping Fang, the Board of Directors includes Siping Fang's son, Binjie Fang, who facially lacks independence from his father and owes his allegiance to his father, and not the Company or shareholders.    The remaining three directors, the purported independent directors, are also dominated by Siping Fang and maintain close business relationships that impart insurmountable conflicts of interests that prevent them from fairly exercising their judgment.    Siping Fang exerts this control and domination through his effective role as the largest shareholder of the Company and the excessive direct payments to each of the Board of Directors for their purported services to the Company. Siping Fang essentially controls at least 34% of the Company's outstanding stock as a result of his shifty sale of 24,300,000 shares of China Valve to his first cousin Bin Li in April 2008. It was also through these relations, specifically Bin Li's wife,that the Company was caused to enter into the related-party Able Delight transaction that transferred unspecified, but significant, monies to Siping Fang and his family.    In addition, the control and allegiance among the Board of Directors, as opposed to the Company and shareholders, has been cemented through the recent increase in substantial payments that are to be made to each purported "independent" director.    Moreover, this reflects that each has benefited from the wrongdoing herein alleged and have engaged I such

conduct to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action. The "independent" directors, Yu, Haus, and Li originally received $17,000.00, $12,000.00, and $12,000.00 annually as cash payment (and does not include stock options) for their services as a director. Inexplicably, but shortly before the disclosures concerning the related party transactions, this amount was increased, at the direction and approval of the Board of Directors, to $60,000.00 annually. In addition, as set forth in ¶¶ 21-23, Haus and Li maintain extensive personal and business relationships that create a conflict of interest that favors non-disclosure of the extent of the fraud and related-party transfers in China Valve and prevent them from acting independently of one another. In essence, they are but a single director. In addition to the ongoing breaches of fiduciary duty, and efforts to prevent the entire truth from being disclosed, the purported "independent" directors have also demonstrated their allegiance to Siping Fing by continuing to nominate him as Chairman, and maintain his employment as President and Secretary, despite the clear fiduciary breaches and improprieties of Siping Fing that the Company has partially admitted to. Likewise, the allegiance is demonstrated by their continued nomination of Siping Fing's son as a director and continued employment as COO. Because of the evidenced conflict of interest, along with allegiance to defendant Siping Fang, there lacks the necessary number of independent Board of Directors to properly consider any demand made upon them.

(d) **The Board of Directors Continued Breaches of their Fiduciary Duties Demonstrates Futility:** The Board of Directors continue to breach their fiduciary duties in connection with (1) reporting and auditing oversight; and (2) the nomination of directors. Consequently, the Board of Directors could not be relied upon to reach a truly independent decision as to whether to commence the demanded actions against themselves and the officers, employees, consultants (including attorneys) or affiliates responsible for the misconduct alleged in this complaint. As set forth in ¶¶25-28, the Accounting Committee has numerous ongoing duties to fulfill for the benefit of the Company. This includes being "primarily responsible for reviewing the services performed by our independent auditors, evaluating our accounting policies and our system of internal controls." Moreover, the Audit Committee Charter set forth that management was responsible for "(a) the preparation, presentation and integrity of the Company's financial statements; (b) accounting and financial reporting principles; and (c) the Company's internal controls and procedures designed to promote compliance with accounting standards and applicable laws and regulation." The Board of Directors continue to violate these provisions and have failed to fulfill even the most basic requirements a fiduciary has in ensuring the adequacy of a Company's auditing and accounting reporting functions, by, among other things: (1) Failing to correct material internal control and accounting deficiencies over the course of several years and which have existed since the inception of the Company; and (2) Retaining an unqualified "independent" auditor that is also

defunct, subject of limitations due to past involvement in accounting fraud, and which is subject of ongoing scrutiny due to its connection with a myriad of like-situated companies involved in accounting misrepresentations and reporting fraud. The "independent directors" also continue to breach their fiduciary duties through their continued nomination of Siping Fang as Chairman of the Board of Directors, and his son, Binjie Fang, as a director. It is undisputed, and the Company concedes, that it engaged in a series of related-party transactions. These transactions were constructed and executed by Siping Fang, and oversaw by his son. Both of these defendants clearly knew that they involved interested parties, given the nature of the transactions, the complex structure that was set up for each, and since one of the transactions involved a family member. They then falsely communicated these transactions to shareholders and caused the Company to transfer assets to family members. Despite these serious infractions, the nominating committee continued to nominate these two individuals as late as June 2011 to serve on the board. In sum, the Board of Directors, including the "independent" directors, have clearly demonstrated that they have vacated their duties, abandoned the Company, and are merely seeking to protect their own self-interest at the expense of the Company and shareholders.

(e) **Two of Three "Independent" Directors Demonstrate Disregard to Fulfilling Their Fiduciary Duties:** In addition to the clear abandonment set forth above, "independent" directors Haus and Li have also demonstrated their abandonment of their posts and indifference to fulfilling their fiduciary duties

owed to China Valves and other companies  Defendants Haus and Li, as set

forth in ¶¶21-23, failed to be aware that Company they served as directors on

had underwent a significant change in operations, changing from a shell to a

profit sharing interest in gambling operations, and had changed its name to

reflect such a business change, despite the event having occurred while they

were directors and four years had passed.  In addition, both Defendants Li and

Haus were associated with Yuhe International, Inc., a Company also now

subject of accounting irregularity charges and claims of material related party

transactions.  In fact, Defendant Li served as the Audit Committee Chairman,

and member of the Compensation and Nominating Committee for Yuhe

International.  Not only does this demonstrate a significant disregard to fulfill

their fiduciary obligations to China Valve, and the other Companies, it also

demonstrates an ongoing failure to investigate improprieties and failure to

seek or consider relief on behalf of a company.  Ultimately, these concurrent

failures create an insurmountable conflict of interest in that further

investigations into the misconduct at either Company will necessarily threaten

their standing among the Chinese Reverse merger investment community.

(f) **Insurance Precludes Requisite Consideration:** On information and belief,

demand is also excused because insurance policies covering the liability of a

company's officers and directors purport to exclude legal claims asserted

directly by the Company against such persons.  Thus, there was, and is, a

substantial disincentive for China Valves to bring any action directly against

the Board of Directors. Generally, under the terms of such directors' and

officers' insurance policies, a company would be required by the carriers to cooperate in the defense of any claims, such as the present action, which seek to impose liability upon certain officers and directors of China Valves, including the Board of Directors  in this action, for misconduct and mismanagement.    Thus, if the policy or policies which China Valves maintains contain the foregoing provision, the insurance carriers would argue that China Valves and its Board of Directors are thereby contractually disabled from complying with any demand that would cause China Valves to institute, and/or prosecute any action against the Board of Directors for such misconduct and mismanagement; because to do so could result in the loss to China Valves of its insurance coverage.

**FIRST CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(Against All Individual Defendants)**

71.    Plaintiff incorporates by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

72.    The Individual Defendants all owed a fiduciary duty to China Valves and its stockholders, the duty to exercise loyalty, good faith, due care and diligence in the management and administration of the affairs of the Company, as well as in the auditing and reporting of the Company, and owed the duty of full and candid disclosure of all material facts thereto.

73.    As fiduciaries, to discharge these duties, the Individual Defendants were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of China Valves.

74.    In performing the aforementioned services, the Individual Defendants all

breached, and continue to breach, their fiduciary duties, causing damages to China Valves, by, *inter alia*, (i) agreeing to and participating with and/or aiding and abetting one another in a deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders and their family members; (ii) failing to discover and prevent China Valves' violations of law (iii) failing to properly implement, oversee and maintain appropriate and adequate internal controls, practices and procedures for China Valves; (iv) failing to ensure that China Valves operated in compliance with all applicable federal and state laws, rules, and regulations requiring the dissemination of accurate financial statements and restricting the misuse of material non-public information; (v) failing to ensure that China Valves not engage in any unsafe, unsound, or illegal business practices; (vi) causing China Valves to be sued for, and exposed to, liability for violations of the anti-fraud provisions of the federal securities laws and potential criminal liability, as previously described herein.

75.     The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit themselves at the expense of the Company and was made without any reasonable efforts to ensure the Company's interests were protected.

76.     The Individual Defendants' breaches of their fiduciary duties have proximately caused, and will continue to cause, China Valves to suffer substantial monetary damages as a result of the wrongdoing herein, as well as further and even greater damage in the future, including exposure to forfeitures, fines and penalties, damage to China Valves' reputation and good will, the resulting loss of business and business opportunities, increased costs of capital, and otherwise.

77.     China Valves has been directly and substantially injured by reason of the

Individual Defendants intentional breach and/or reckless disregard of their fiduciary duties to the Company. Plaintiffs, as shareholders and representatives of China Valves, seek damages and other relief for the Company, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**GROSS MISMANAGEMENT**
**(Against All Individual Defendants)**

78.    Plaintiff incorporates by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

79.    The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage and control the Company's operations and business.

80.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of the Company in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of the Company's affairs and in the use and preservation of its assets.

81.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused the Company to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company. As a result, the Individual Defendants grossly mismanaged the Company.

82.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of fiduciary duties, including the duty of loyalty, as alleged herein,

China Valves has incurred, and will likely incur in the future, massive financial damages, as well damages to its reputation and goodwill.

83.     As a result of the misconduct and breaches of fiduciary duty alleged herein, each of the Individual Defendants is liable to the Company.

## THIRD CAUSE OF ACTION

## <u>CORPORATE WASTE</u>

### (Against All Individual Defendants)

84.     Plaintiff incorporates by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

85.     By failing to properly consider the interests of the Company and its shareholders, by failing to conduct proper supervision, and by giving away Company assets to defendant Siping Fang and his family members via the self-interested transactions identified above, the Individuals Defendants have caused the Company to waste valuable corporate assets.

86.     As a result of Defendants' corporate waste, they are liable to the Company.

## FOURTH CAUSE OF ACTION
## <u>RESTITUTION/UNJUST ENRICHMENT</u>
### (Against Defendant Siping Fang)

87.     Plaintiff incorporates by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

88.     Defendant Siping Fang was unjustly enriched by his receipt and retention of benefits from the self-interested transactions and the proceeds he received therefrom, as alleged herein, and it would be unconscionable to allow him to retain the benefits thereof.

89.     To remedy Defendant Siping Fang's improper gains and to avoid unjust

enrichment, the Court should order Fang to disgorge to the Company all of the funds he has received from the elf-interested transactions.

### FIFTH CAUSE OF ACTION
### CONTRIBUTION AND INDEMNIFICATION
#### (Against All Individual Defendants)

90.    Plaintiff incorporate by reference all paragraphs above as if set forth herein. China Valves is alleged to be liable to various persons, entities and/or classes by virtue of the same acts or circumstances as are alleged herein to give rise to the Individual Defendants' liability to China Valves.

91.    In addition, the Individual Defendants' misconduct and wrongdoing, and the disclosures and events described herein, have had, and will continue to have, a series of deleterious effects on China Valves, including but not limited to: (i) Exposure to forfeitures fines, and penalties; (ii) Loss of business opportunities; (iii) Damage to China Valves' reputation and good will; (iv) Loss of existing or renewal business; (v) Increased costs of capital; (vi) Loss of confidence of the investing public in the integrity and management of China Valves, thereby resulting in China Valves losing market value and increasing China Valves' costs of capital; and (vii) As a result of the Individual Defendants' misconduct, China Valves is now exposed to SEC scrutiny and inquiry, and to suit by investors for losses resulting from their misconduct and fraudulent activities, thereby, at a minimum, causing the Company to incur unnecessary direct and indirect investigatory, litigation and administrative costs, and potentially resulting in awards, judgments or settlements against China Valves.

92.    By reason of the foregoing violations of law and other related misconduct described herein, China Valves' alleged liability arises, in whole or in part, from the intentional,

knowing, reckless, disloyal and bad faith acts or omissions of the Individual Defendants as previously alleged herein.

93.    China Valves is therefore entitled to contribution and indemnification from each of the Defendants in connection with all such claims that have been, are or may in the future be asserted against China Valves by virtue of Defendants' misconduct and wrongdoing.

## PRAYER FOR RELEIF

WHEREFORE, Plaintiffs pray for relief as follows:

1.    For damages against Defendants in an amount to be proven at trial;

2.    For attorneys' fees as legally permitted;

3.    For costs of suit incurred herein;

4.    For pre-judgment and post-judgment as allowable by law;

5.    For other further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury for all causes and issues so triable.

Dated: September 13, 2011                    Respectfully submitted,

                                             THE ROSEN LAW FIRM, P.A.

                                             Laurence M. Rosen (LR 5733)
                                             Christopher S. Hinton (CH 0759)
                                             Phillip Kim (PK 9384)
                                             275 Madison Avenue, 34th Floor
                                             New York, NY  10016
                                             Phone: (212) 686-1060
                                             Fax: (212) 202-3827

                                             Attorneys for Plaintiff

<u>VERIFICATION</u>

I, Hugues Gervat, am the plaintiff in the within action and am a citizen of the State of Wisconsin. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on September 8, 2011 in Milwaukee, WI.

_____
Hugues Gervat